JOHN W. SHERWOOD, Appellant, v. GREATER MAMMOTH VEIN COAL COMPANY et al., Appellees.

DEEDS: Construction—Scope of Easement. The right, in a deed to
1    coal underlying lands, to sink shafts, and therefrom to take coal underlying said lands and other adjoining lands, and to construct a railway across said lands "to and from any mine or mines," carries the right to maintain said railway for the purpose of carrying coal from *any* lands in the same coal field, when said coal field was notoriously acquired as one enterprise, and under a series of deeds, embracing identical provisions, from various owners. Principle recognized that the construction of a deed of doubtful import

may be aided by giving due consideration to the circumstances under which it was executed.

**CORPORATIONS:** State Only May Question Legal Existence. Quo
2 warranto is the *exclusive* remedy to test the legal existence of a corporation.

**COSTS:** Insufficient Tender. Costs may not be taxed to a successful
3 litigant on the ground that his tender up to the time of trial was insufficient, when he made ample tender in the pleadings, and when it is manifest from the record that no tender would have been accepted in any event; nor does the paying of such tender into court after trial waive the right to object to such taxation.

*Appeal from Marion District Court.*—J. H. APPLEGATE, Judge.

NOVEMBER 23, 1921.

REHEARING DENIED MARCH 11, 1922.

ACTION in equity, asking for an injunction restraining defendants and intervener railway company from entering upon the premises of the plaintiff and constructing a railway track for a coal switch or road across plaintiff's premises, and from operating the railway by carrying coal over said right of way and road from other lands. The trial court found for defendants and interveners, and dismissed plaintiff's petition, but rendered judgment for the costs against the defendants and interveners. The plaintiff appeals from the finding and decree in favor of defendants. The defendants and interveners appeal from that part of the judgment as to the costs.—*Affirmed on plaintiff's appeal; reversed on defendants' appeal.*

*Vander Ploeg & Johnson,* for appellant.

*Stipp, Perry, Bannister & Starzinger, W. H. Lyon,* and *J. C. Cook,* for appellees.

PRESTON, J.—The case turns largely upon the interpretation of certain provisions in a deed, under which plaintiff, defendants, and interveners claim. Under the deed, plaintiff

1. DEEDS: construction: scope of easement.

claims that defendants and interveners do not have the right to construct and operate the road across his land, for the purpose of hauling coal

from other lands, while defendants and interveners claim that they do have such right. The allegations of plaintiff's petition, as to the ownership and that defendants and interveners were constructing and proposed to operate the road across his land, being admitted, the defendants and interveners assumed the burden. There is substantially no dispute in the evidence. The coal field which is about to be developed consists, as defendants allege, of some 3,000 acres of coal land. Near the center of this field is the Virgil Roberts land, and some lands of others. This Roberts land is between a large body of land to the east, about 1,600 acres, the coal under which and the surface rights to which were acquired some years ago by the Excelsior Coal Company, and a somewhat smaller body, of 400 acres, to the west, also acquired by the Excelsior Coal Company. That company also acquired two smaller tracks of about 200 acres, south of the intervening strip: that is, the company bought the coal and acquired surface rights in the land to the west and south. The defendant Greater Mammoth Vein Coal Company has acquired a tract west of and adjoining the intervening strip before mentioned, and adjoining on the east the west tract of the Excelsior Coal Company; also the coal, mining, and surface rights in the Roberts and other lands. The evidence shows that this last named company was organized for the express purpose of developing and mining this entire coal field, including the Excelsior Coal Company's coal and the Roberts coal. It was organized in 1918. The first suggestion to the organizers of the company as to the development of this coal field came from the Excelsior Coal Company. Pursuant to this suggestion, a lease of the Roberts land was obtained by some of the organizers, and then the company was organized. After purchasing the Roberts coal, the company purchased the Rodgers farm, of 186 acres, lying west of the Roberts land, and 67 acres of the surface and coal belonging to the Excelsior Coal Company, immediately. west of the Roberts land. Thereafter, the drilling done in the coal field showed that the practical place to sink a shaft was on the Roberts land. The town of Tracy is some four or five miles east of the Excelsior lands. Defendants and interveners propose to run a coal road from the town of Tracy west through the east tract before mentioned, to the Roberts

land and other lands of the Excelsior Coal Company, and others in the field to the west and south. Plaintiff's land is in the east tract of the Excelsior Coal Company property, and is situated a mile or so from the Roberts land. Defendants and interveners claim the right to cross plaintiff's land and haul coal from the west to the town of Tracy, and from there to the coal market. This much by way of preface, and to show, in a general way only, the situation.

The petition alleged that the defendant Mammoth Vein Company and defendant Shugart, having the contract for constructing the grade, had entered upon plaintiff's premises, and were engaged in the construction of a grade for the railroad. Later, plaintiff amended the petition, stating that, at the time of the trial, in October, 1919, said defendants had continued the work of grading, and that they intended to place ties and steel upon the grade, and to fence the right of way. Said defendants admitted that they were constructing a coal switch over plaintiff's land, but alleged that it was being constructed for and in behalf of the Wabash Railway Company, under authority from the Excelsior Coal Company; that this authority was originally granted by a deed from plaintiff to the Excelsior Coal Company, by which said coal company purchased the coal underlying all of plaintiff's land, and certain rights in the surface, for the sum of $4,440; that the deed was made in 1903, and recorded a short time thereafter. The purchase price was paid to plaintiff at the time of the execution of the deed. The coal under plaintiff's land and in the coal field was undeveloped and untouched until 1917. None of the rights under the deed had been exercised for several years, and plaintiff's land had not rendered anything for the money received. The rights conveyed in the surface, under which defendants claim they appropriated the right of way in question, are contained in Paragraph 6 of the deed, and are as follows:

"The right to appropriate and use and to authorize and cause *any railroad company* to appropriate and use, for *railroad right of way* to and from *any* mine or mines, the surface of said land over the coal above described and granted upon paying for such use to the owner at the time of any such appropriation of any land so appropriated over the said one hun-

dred and six (106) acres of coal, at the rate of seventy-five ($75) per acre, and upon paying to the owner at the time of any such appropriation of our aforesaid interest in any land so appropriated of the aforesaid fifty-two (52) acres, at the rate of twenty-five dollars per entire.acre; but the right last above mentioned is nevertheless granted upon these two express conditions: First, that any such railroad company shall properly fence its railroad upon said land and there put in all necessary cattle guards and crossings and properly maintain all thereof so long as it shall there operate its railroad; and second, that whenever any of said land appropriated as last aforesaid shall cease to be used for such railroad purposes the right lastly above mentioned shall in respect thereto wholly cease and determine.''

Other rights and privileges were granted in Paragraph 2 of said deed, which reads:

''The right to drill, sink, construct and operate in and upon said land all such prospect holes, prospect shafts, air, water and hoisting shafts, and all such slopes as said coal company, its successors or assigns shall at any time deem expedient; *and to have and use sufficient right of way to and from the same;* but the right lastly described is nevertheless granted upon these two express conditions: First, that no hoisting shaft shall be located within forty (40) rods from said dwelling house or from said barn; and second, that the said coal company, its successors or assigns, shall properly fence and keep fenced, all parts of the premises affected by the exercise of the right last aforesaid.''

Paragraph 3 grants the right to appropriate and use the surface of said land at and about any hoisting shaft; Paragraph 4, the right to use the surface of said land to the extent of one fourth of an acre at and above each air shaft and water shaft, without other or further compensation; Paragraph 5, the right to *dig* and *dump out of shafts, coal from any neighboring land,* and for *such purpose to use such entries under* the land hereinbefore described. The Excelsior Coal Company intervened, and alleged that, during the latter part of 1902 and the early part of 1903, it purchased from the different owners (about twenty) the coal underlying their several parcels of land in a

large coal field or territory, with intent to open and develop a mine or mines and market the coal; that said coal field was located in three townships in Marion County, and comprised 2,200 acres of coal lands, among which was that of plaintiff; that in each of the several deeds made by the different owners, there was included an agreement in words and figures identical with that set out in plaintiff's deed; that the coal in said field purchased by intervener consisted principally of two parts or blocks, said field being divided by coal lands in Sections 25 and 36, known as the Roberts coal field; that the coal under the Roberts land could not then be purchased by intervener, and was subsequently acquired and leased by the defendant Greater Mammoth Vein Coal Company; that it is wholly impracticable and would be entirely unprofitable to attempt to mine the coal belonging to the intervener, without having railroad facilities to transport the coal to a suitable market; that Des Moines is the nearest suitable market; and that the only railroad or railroads that pass in the vicinity of this coal field and reach Des Moines are the Wabash and the Chicago, Burlington & Quincy Railways; and that Tracy is the nearest railroad station to this coal field; that this intervener had arranged with the Wabash Railway Company to build a railroad in connection with its main line at Tracy through the easterly block of its coal land, including plaintiff's land, with the intent to extend the same through the intermediate lands of the Greater Mammoth Vein Coal Company, and into the westerly block of coal belonging to intervener; that, with the view to the construction of the railroad aforesaid, intervener has authorized and caused the Wabash Railway Company to appropriate and use for the building of said road a strip of land of the usual width through and over the quarter section of land of plaintiff; that the work of which plaintiff complains herein is proceeding and being prosecuted by said railroad company, under this provision in said deeds to intervener, and pursuant to the authorization of this intervener.

The Wabash Railway Company intervened, and alleged that it had made a survey and located the line of railroad, and that it was engaged, through defendant Shugart, in constructing the road; that, when the railroad is completed, it is to be

used for a coal road, for carrying coal from the said coal field to Tracy; that the track is being constructed in accordance with the railroad regulations in such respects, which require the cost of the right of way and the grading to be borne and paid by the industry to be served by the track; that, when completed, the track will be owned by the railway company, and will be operated by it as a part of its railroad system in Iowa, for the purpose of hauling coal and coal products mined from plaintiff's land and other lands adjacent thereto. The answer of defendants and both petitions of intervention allege that plaintiff had been tendered the sum of $506.25 for the 6.75 acres taken, at $75 per acre; that this was done before plaintiff's land was entered upon, and pursuant to an appropriation of said land by the Excelsior Coal Company for the purpose of building a railroad; and that defendants were upon said land under the authority and with the consent of the Excelsior Coal Company. The plaintiff, answering the intervention of the Excelsior Coal Company, alleged that the charter of said company had expired, and that it was no longer a corporation, and had no right to enter into any contract or engage in any business, and was attempting to assign and transfer its right of way, and that it had no right so to do; denied the tender; and denied that the Excelsior Coal Company had authorized the Wabash Railway Company to appropriate and use the right of way. Answering the intervention of the railway company, plaintiff alleged that the track was being constructed across plaintiff's land by the Greater Mammoth Vein Coal Company, and that, upon the completion of the road, it was proposed that the Wabash Railway would use the same for transportation of coal mined from other lands than those belonging to plaintiff, and coal from lands not belonging to the Excelsior Coal Company; that the transportation of coal over said right of way from any other land than that belonging to the plaintiff is contrary to the provisions of the conveyance by plaintiff to the Excelsior Coal Company.

Before defendants went on plaintiff's land, the Excelsior Coal Company, by appropriate resolution, made a formal appropriation of the necessary right of way across plaintiff's land, for the construction of a railroad track. The plaintiff

was notified in writing by the Excelsior Coal Company that it desired to appropriate and use the surface of a strip of land across plaintiff's land, describing it, for the construction of a railroad, as at present surveyed, across plaintiff's land; and that it did so appropriate such right of way. At the same time that the Excelsior Coal Company passed its resolution appropriating the right of way, and in pursuance of the arrangements and agreements for the development of the whole field, the Excelsior Coal Company, acting, as it claimed, under the provisions of the deed from plaintiff, authorized the Wabash Railway Company to appropriate and use this right of way and build this track. This was done by proper resolution, passed by the company, and appearing in evidence.

The president of the Excelsior Coal Company testified that since he has been active in the affairs of the company, it had been desirous at all times of obtaining a railroad over which they could ship the products of any mines which might be opened on the property; that coal lands without a railroad immediately adjacent thereto are valueless; that the reason his company authorized the Wabash Railway to construct the road over its property and the property controlled by it was in order to give facilities they wanted, and in order to develop their property; and that the ultimate object of the road was not only to mine coal in their east block, but to take that out in the west, by extending the railroad, or by taking out the coal in the west block through underground entries and hoisting it on the Roberts land; that the road was located and surveyed with reference to the location of a shaft upon the east block of the Excelsior Coal Company's coal, so that the line would be located in an advantageous way for the sinking of a shaft on the Excelsior property; that two surveys were made, to determine the most practical line for a railroad connecting with the Wabash and Burlington roads at Tracy, and the line of the railroad was located and staked; that it is not practicable to reach the west block of coal of the Excelsior Coal Company, including the portion purchased by the Greater Mammoth Vein Coal Company from the Excelsior Coal Company, by another route than on the line of railroad being built; that the road stops on the Roberts land, and is so located that it can be extended west

into the block of coal owned by the Excelsior Coal Company, and so as to serve that block; that the coal from this west block could also be hauled through underground entries and hoisted on the Roberts land; that the Greater Mammoth Vein Coal Company is planning to sink another shaft west of the present shaft; and that it is the purpose of the Excelsior Coal Company to have the coal from their land hauled out over the switch under construction.

1. As said, the more important point in the case is the construction of the deed from plaintiff to the Excelsior Coal Company. Counsel for both parties have cited a large number of cases, and the argument is somewhat extended as to whether the rights granted the Excelsior Coal Company by the plaintiff to construct a railroad constitute an easement appurtenant or an easement in gross. Appellant erroneously, we think, assumes that there is but one easement granted. It is quite clear that other easements than the one giving the right to build a railroad across the land are contained in the deed. There might be some difficulty in classifying some of the different kinds of easements, according to the books. There seems to be some difference of opinion in some of the cases. Appellant's first contention was that the provision as to the railroad was appurtenant only to the land conveyed by plaintiff. They so plead it. Some of the cases cited by appellant are on the proposition that the easement is appurtenant only to the land conveyed by the plaintiff. They now contend that it is appurtenant to the lands owned by the Excelsior Coal Company,—that is, the coal field of that company alone. In other words, we understand them to now concede that the right is granted to convey coal across plaintiff's land from the block of coal of the Excelsior Coal Company lying to the east, and the coal in the block of said company lying to the west, but they say there is no easement or right granted to haul coal from any other land. In other words, they seem to concede that this would apply to the coal field or to that part of the coal field owned and controlled by the Excelsior Coal Company. True, in the pleading before set out, appellant pleads it both ways. It should be noticed that the defendant Greater Mammoth Vein Coal Company owns a part of the Excelsior Coal Company's land lying west of the

Roberts strip. On the other hand, appellees contend that, under the deed, they have a right to haul coal over plaintiff's land from the entire coal field of which the Roberts and other lands, now owned and controlled by the Greater Mammoth Vein Coal Company, are a part. This was the holding of the trial court. It would seem, then, that the dispute between the parties resolves itself into the question as to the size of the coal field, whether it embraces all of the field or only that part of it owned by the Excelsior Coal Company as a separate coal field. We are of opinion that the right or easement was not appurtenant to plaintiff's land alone, nor to the land of the Excelsior Coal Company alone. The cases seem to state the rule substantially thus: Whether an easement in a given case is appurtenant or in gross is to be determined mainly by the nature of the right and the intention of the parties creating it. All the cases agree that, if the language in the instrument is ambiguous, it is proper, in aid of its interpretation, to take into consideration the setting,—the circumstances surrounding the parties at the time,— tending to show what was within the contemplation of the parties.

We shall mention some of the circumstances bearing on this question. In the fall of 1902, the Excelsior Coal Company started to drill a large body of these coal lands in the vicinity of plaintiff's land. As the drilling progressed, in the fall of 1902 and the spring and early summer of 1903, the company purchased outright the coal, consisting of about 2,200 acres. The drilling progressed for over a year; there were four or five coal drills working; and it was generally discussed in the neighborhood that the Excelsior Coal Company was purchasing the entire coal field. Another witness says that Mr. Shepherd, of Oskaloosa, came over and took options on the land, and drilled it; that he was through the country quite a while; that he first optioned the land and then drilled it, and then, if they were satisfied with it, came to the owner and tried to buy it. It appears that they were not able to purchase the Roberts coal. Another witness testified that it was talked around that they were getting all the coal,—trying to get all of it; "don't know of but one piece but what they did get, right there." All the deeds taken were similar in form, and conveyed identical sur-

face rights. These facts were known to plaintiff, at least by reputation, or rather, known from the notoriety of the purpose of the coal company, and from the number of the transactions. Plaintiff was a witness in the case, testifying briefly in regard to the leaving of a check at his house, and to the tender and service of notice, and when the graders came, and his giving them permission to camp on other land. He does not claim that he did not know of the situation and circumstances stated.

The lands purchased were the larger part of a general coal field of about 3,000 acres. The Excelsior Coal Company paid full value for the rights claimed. The deeds granted the right to a right of way to a shaft or mine on plaintiff's land. It also granted the right to appropriate and use the surface, and to authorize any railroad company to appropriate it for railroad right of way to and from *any* mine or mines, upon paying therefor $75 per acre. We think that these two provisions conferred upon the Excelsior Coal Company the right to a right of way to a shaft on plaintiff's premises, and to a right of way to a railroad for itself or for any railroad company across plaintiff's land to any mine or mines. We think this means, to any mine or mines in the coal field, including that part which the Excelsior Coal Company could not or did not buy. It was generally understood in that neighborhood that the Excelsior Coal Company was trying to buy all of it. It is significant that Paragraph 5 of the deed before set out gives the right to dig and dump coal from any neighboring land, and to use the underground entries under plaintiff's land. It was in the minds of the parties that other coal than that dug from the plaintiff's land might be hauled over the railroad constructed, under the provisions of the deed. The language does not limit the coal that might be so taken from other lands to lands owned by the Excelsior Coal Company, the deed granting a right to sink a shaft on plaintiff's land, and, as said, to use the underground entries. Clearly, it was not intended or contemplated by the parties that coal might be dug on other land,—for instance, the land of the Greater Mammoth Vein Coal Company,—conveyed therefrom to plaintiff's land through a shaft thereon, and dumped on plaintiff's land, without the right to haul it therefrom over the railroad to market. The deed from plaintiff

was taken after some of the coal had been purchased in this field by the Excelsior Coal Company, and before other parts of it were purchased. The prospecting for coal was going on for more than a year, and did not terminate for some months after the execution of plaintiff's deed.

Without reviewing the many cases cited on the question as to whether the easement granted or created should be named in a class as appurtenant or in gross, within the meaning of the legal terms, it is enough to say that, from the nature of the right and the intention of the parties, the easement was not appurtenant, in the sense that the right of way may be used only to haul coal mined from the land of the plaintiff or the Excelsior Coal Company. It is clear that the parties contemplated the larger field. Indeed, from the language of the instrument itself, there is little chance for argument, and it is less so when all of the circumstances are considered.

2. It is claimed by appellant that the charter of the Excelsior Coal Company had lapsed or expired, because the statute existing at the time of its organization had been repealed, and

2. CORPORATIONS: State only may question legal existence.

that thereby its charter had been dissolved, and that, therefore, it had no authority to do business, at the time of the transactions involved in this case. The company was duly organized and commenced business in 1877, and its charter was for 50 years. These 50 years have not yet expired, and will not until 1927. The articles of incorporation of the company state that the object is to buy and sell and lease and trade in coal and coal lands, open and operate coal mines, and so on; also, to construct and operate such tracks and ways, either common roads or railroads, as may be necessary to the development of the company's property. The statute in force in 1877, Section 1069, Code of 1873 (Section 1618, Code of 1897), authorized a charter to continue 50 years, for such an incorporation as this. Thirty-two years thereafter, in 1909, the legislature, by Chapter 104, Acts of the Thirty-third General Assembly, repealed the section providing for a 50-year franchise, and provided that corporations of this character might be formed to endure not to exceed 20 years. As said, it is appellant's contention that, upon the repeal of the statute and the enactment of another in lieu thereof, the com-

pany's charter *ipso facto* became dissolved. We understand the claim to be that, after 20 years from its organization, the company had no life or authority to do business. It will be observed, however, that, at the time of the repeal of the statute and the enactment of Chapter 104, Acts of the Thirty-third General Assembly, the company had already been in existence 32 years. It will also be observed that, when plaintiff made the deed to the company in 1903, and received the money for his coal, 26 years of the life of the company's charter had passed, and the statute had not yet been repealed, and was not until 6 years later. It is true that the authorization by the Excelsior Coal Company to the railway company was after 1909. Appellees contend that, under Code Section 48, Paragraph 1, the repeal of a statute does not affect any right under or by virtue of the statute repealed; that, under the state and Federal Constitutions, no ex-post-facto law nor law impairing the obligation of contracts shall ever be passed. In response to this, appellant asserts that, under Section 1090 of the Code of 1873 (Section 1619, Code of 1897), the legislature has authority to alter, abridge, or set aside articles of incorporation. As to this, the appellees say that Chapter 104, Acts of the Thirty-third General Assembly, on the face of it, refers only to corporations formed in the future, and that statutes are not retroactive, unless expressly so provided, and that, under Section 48 of· the Code, the rights of this company are not affected by the repeal. It is further contended by appellees that, even though there was any force in appellant's contention as to the lapse of the articles of incorporation, still the company would have the right to close up its business, and for that purpose authorize the railroad company, under the deed from plaintiff, to construct a railroad to the coal field, for the purpose of realizing upon its assets in the sale of coal, which would be substantially of no value without a railroad. And finally, it is contended by appellees that the State alone can raise the question as to the corporate existence of the Excelsior Coal Company.

We are of opinion that the last proposition is well taken. This renders it unnecessary to discuss the other questions. It should have been said that appellees also contend that plaintiff, having dealt with the Excelsior Coal Company, is estopped to

question its capacity to contract. On this they cite *Washington College v. Duke,* 14 Iowa 14; *Howe Machine Co. v. Snow,* 32 Iowa 433; and Code Section 1636. These cases, and *Courtright v. Deeds,* 37 Iowa 503, *State Bank Bldg. Co. v. Pierce,* 92 Iowa 668, and *Franklin v. Twogood,* 18 Iowa 515, are cited to the proposition that no person sued on a contract entered into with a de-facto corporation will be permitted to set up as a defense to the action the failure of the corporation to have perfected its organization in the manner prescribed by the statute. They also cite *Cedar Rapids Water Co. v. City of Cedar Rapids,* 118 Iowa 234, to sustain their contention that the question of corporate capacity of a corporation to act as such can be tested only by direct proceedings, and may not be collaterally attacked. Also, 10 Cyc. 256, 261; 2 Cook on Corporations (6th Ed.), Sections 632, 637.

The instant case is an action in equity, and for injunction, in which appellant seeks to test the existence of the coal company as a corporation. The statute in regard to injunctions is Code Section 4354. The action of quo warranto is provided for by Section 4313 of the Code. Under this, an ordinary action in the name of the State may be brought against a corporation acting as such, or exercising powers not covered by law, and so on. We held, in *Harvey v. Kirton,* 182 Iowa 973, and *Nelson v. Consolidated Ind. Sch. Dist.,* 181 Iowa 424, that in such a case the action of quo warranto is exclusive. In both cases, an injunction was asked and denied, because the matter of testing the legality of a corporation or the election of officers therein must be determined by an action in quo warranto by the State. In the *Nelson* case, we said, at page 434:

"We think the rule equally well settled and sound that private citizens cannot raise such question by any form of direct attack. Quo warranto is the proper and, in the absence of statute, the exclusive proceeding to determine the question of the legal existence or validity of the organization of a public corporation. * * * The essential point is that the right to draw in question the legality of an existent body of the character mentioned is the prerogative of the state, and not of private litigants. * * * It is an application of the principle that public rights are to be vindicated by public authority. * * * The private litigant

should not be permitted to reach the same result by a change of form of action."

In this case, the charter was issued by the state. The statute makes no distinction between school corporations and corporations like the one in question. These cases are, we think, decisive of this point.

3. The foregoing are the points most argued and relied upon by appellant for a reversal. There is some suggestion that a contract for an easement is within the statute of frauds. We take it that this has reference to the agreement with the Wabash Railway Company. If this is the point, then it is enough to say that it is not denied by the party to be charged, but on the contrary, is expressly admitted, pleaded, and relied upon by both of the parties to that agreement; hence needs no evidence to support it.

It is also suggested that the contract is not assignable. The last proposition seems to be on the theory that an easement appurtenant cannot be assigned to a third person without the conveyance of the dominant estate. We think this has been disposed of by our holding that the easement is not appurtenant, in the sense contended for by appellant. It is more a question of the right to authorize a railroad to build a track, under the very terms of the contract itself. Under our statute, contracts are assignable. But these points seem not to be relied upon.

The opinion is already too long, and we deem it unnecessary to further consider these two propositions. They are mentioned in the points, but not argued. It is argued by appellant that, if the deed is construed as defendants contend, defendants and interveners could construct other railroad tracks across his land. The defendants and interveners are not claiming any such right, and the record shows that they disclaim it. The decree of the trial court does not give them that right. It should have been said before, perhaps, that it is contended by defendants that, if the provision in plaintiff's deed, and in the 20 or 21 other deeds from landowners in the Excelsior Coal Company field, is to be construed as appurtenant to each tract, they would have to build 21 railroads, and would then have the right only to transport the coal from one side of each tract to the other side of it.

4. The trial court taxed the costs of the trial to defendants and interveners, though they were the successful parties. This was on the theory, we suppose, that defendants and interveners had not properly tendered to plaintiff the amount due before they entered upon the land.

3. COSTS: insufficient tender.

The deed provides that this must be done at the time of the appropriation, and that defendants should pay at the rate of $75 an acre. Six and three-fourths acres were taken. This would amount to $506.25. There is no dispute as to the amount of land appropriated for the right of way, and no dispute but that the amount just mentioned was the correct and proper amount. This was not a matter of controversy at any stage of the trial, and no costs were made on that question. Plaintiff was contesting the defendants' rights in the premises on numerous other grounds. He was contesting the very right of appellants to go on the land at all. Defendants and interveners attempted two or three times to tender that amount. Plaintiff did claim that the amount was too small, but not that it was too small under the terms of the deed. We take it that he thought it was too small because land is worth more now than it was 18 or 19 years ago. It appears without dispute that, before going upon the lands, the Wabash Railway Company sent its agent to plaintiff, and tendered him the full amount described by the deed, pursuant to authority previously conferred upon it by the Excelsior Coal Company. Thereafter, and in May, an agent of the Excelsior Coal Company was sent to plaintiff's residence, and again offered him the amount provided for, which he refused. In the first tender, the company requested or demanded a deed from plaintiff for the right of way. At the second tender, plaintiff was tendered a receipt for plaintiff to sign, acknowledging receipt of the money, and in it is a statement that said right of way is granted pursuant to terms of the deed made by plaintiff to the Excelsior Coal Company concerning said lands in 1903, and recorded in deed records of Marion County. The second tender was likewise refused by plaintiff. Neither tender was refused on the ground that it was not the proper amount according to the deed and the amount of land taken. Plaintiff contends that both these tenders were conditional, and that, therefore, they were not good tenders.

In the first one demanding a deed, it may have been conditional. It is not so clear as to the second, because the statute, Code Section 3063, provides that:

"The person making a tender may demand a receipt in writing for the money or article tendered, as a condition precedent to the delivery thereof. The person to whom a tender is made must, at the time, make any objection which he may have to the money, instrument, or property tendered, or he will be deemed to have waived it."

The receipt tendered with the second tender recites that it is under the deed from plaintiff to the coal company. At the close of the evidence, defendants amended their pleadings, stating that they were "ready, able, and willing, and now offer to pay said sum of money to the plaintiff, and also offer to do and perform, and to have performed, everything that is required by the terms of the deed, and offer further to do any and all things which this court may require of either intervener as a matter of equity." This last offer in the pleadings, in equity, was clearly sufficient. But, as said, it came at the close of the evidence. As said, plaintiff refused to accept the first tender, and refused and even now refuses the tender in the pleadings. There is no pretense that he would have accepted the money under any circumstances. On the contrary, it appears that he would not have done so, even though the tenders had all been formally made, and in strict compliance with the law. As said, the amount due under the deed was not a matter of dispute or contest, and the trial court found that the amount tendered was the amount due. The case is in equity. Under the circumstances, we think that the making of a technical tender is dispensed with and waived, plaintiff having declared, both by his words and by his acts, that he would not receive it. 38 Cyc. 144; *Steckel & Son v. Standley,* 107 Iowa 694; *Austin v. Smith & Holliday,* (Iowa) 109 N. W. 289. 26 Ruling Case Law 624 states the rule thus:

"Since the law does not require anyone to do vain or useless things, a formal tender is never required where it appears that, if it had been made, the money would not have been received."

See, also, pages 625 and 626. It would seem that the only

objection made by plaintiff to receiving the money was an objection that was not tenable, and that he waived all objections under the statute before cited. See, also, 26 Ruling Case Law 628, where the rule is stated that, by objecting on one ground, he waives all others. As said, the plaintiff was contesting the right of defendants and interveners to go on the land at all, and on other grounds. Plaintiff, all the way through, has been contesting the matter on other grounds. The case is somewhat analogous to the situation in *Bobzin v. Gould Bal. Valve Co.,* 140 Iowa 744, 750, where it was claimed that an injunction would not lie, because there was no threatened invasion of plaintiff's rights, but it appeared that the defendants in the Supreme Court and in the district court were contending for their right to do the very act which plaintiffs say they intended to do. See, also, *Dunham v. Dunham,* 189 Iowa 802. We are constrained to hold that the trial court erred at this point.

5. It appears that, after the trial and decree in the district court, interveners paid the $506.25, with interest, into court. It is thought by plaintiff that, because of such payment, defendants and interveners have waived their right to appeal from the judgment against them for costs. The costs have not been paid. The appeal is from the judgment for costs. We think there is no merit in this claim. The defendants were required to pay this amount of money at the time of the appropriation of the right of way. They offered and tried to pay it before. It was necessary that they should pay it, or tender payment, before they went onto this land. By paying the amount into court which they were required to pay as a condition precedent to occupying the land, they are now but keeping their tender good, and preserving their right to occupy the land.

Another case, entitled *Worth Stroud et al. v. Greater Mammoth Vein Coal Company et al.,* No. 264/33787, involves the same questions as the instant case, except as to the judgment for costs. That case was submitted with the instant case, and it is affirmed. The instant case is *affirmed* on the plaintiff's appeal, and *reversed* on the appeal of defendants and interveners.

EVANS, C. J., WEAVER and DE GRAFF, JJ., concur.